CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
KATE L. MORRIS (Bar No. 332159)
(E-Mail: Kate_Morris@fd.org)
KIM SAVO (Bar No. 223197)
(E-Mail: Kim_Savo@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
MALIK LAMONT POWELL

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21-CR-00256-JFW |
| Plaintiff, | **MALIK LAMONT POWELL'S POSITION REGARDING SENTENCING; OBJECTIONS TO PSR; EXHIBITS A-L** |
| v. | |
| MALIK LAMONT POWELL, | |
| Defendant. | **Sentencing Date:** February 14, 2022 |
| | **Sentencing Time:** 8:00 A.M |

1       Defendant Malik Lamont Powell, by and through his attorneys, Deputy Federal

2   Public Defenders Kate L. Morris and Kim Savo, hereby submit the following

3   memorandum in support of his sentencing position.  The defense respectfully requests a

4   sentence of 120 months imprisonment, followed by 5 years of supervised release.

5                                           Respectfully submitted,

6                                           CUAUHTEMOC ORTEGA
7                                           Federal Public Defender

8
    DATED:  January 31, 2022        By  /s/ Kate L. Morris
9                                       _____
                                        KATE L. MORRIS
10                                      Deputy Federal Public Defender

11
    DATED:  January 31, 2022        By  /s/ Kim Savo
12                                      _____
                                        KIM SAVO
13                                      Deputy Federal Public Defender

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. INTRODUCTION

"I had so much built up anger which caused me to commit an unnecessary act of violence like this.  I don't blame anyone else but myself for my actions . . . . I never thought about the consequences of my actions, moreover I never thought about what could happen.  I never intended for anyone to get hurt which clearly demonstrates I[] made a very poor choice at the time . . . . I think about the victims everyday and wonder what they go through."  Exh. A (Malik Powell Letter) at 1-2.

\*\*\*

At twenty years old, Malik Powell agreed to participate in a robbery at the behest of the gang that had recruited him two years earlier, when he was just eighteen.  He was ripe for the picking.  His own childhood had been shaped by gang violence: his father was murdered by a gang when he was just five years old.  After his father's death, his mother—now a single mother of three—moved around constantly, fearing gang reprisals and desperate for work.  They spent periods of time homeless, living with family, in motels, and in a van near LAX airport.  Mr. Powell was constantly being uprooted; even the van they lived in was towed on one occasion.  He attended twelve different schools.  Virtually all the men in his life were violent or had been killed by violence.  For a short period, things stabilized when a loving stepfather came into his life and the family put down roots.  He flourished during these brief periods of stability, showing his potential as a caring young man and talented athlete.  But these reprieves were short-lived, disrupted by homelessness and the incarceration of his stepfather.  Lacking hope and direction, Mr. Powell was recruited by a gang shortly after his eighteenth birthday.  Before joining the gang, he had never been arrested.

As explained *infra*, the defense disagrees with the PSR's assessment of the guidelines and submits that Mr. Powell's correct range on all counts is 157-166 months.  The defense respectfully requests a sentence of 120 months imprisonment, followed by five years of supervised release.  This is a serious sentence for a young man who is in Criminal History Category I, has never been to prison, and is truly remorseful.

1

## II. A 120-MONTH SENTENCE IS SUFFICIENT FOR MR. POWELL, WHOSE CHILDHOOD MADE HIM RIPE FOR GANG RECRUITMENT AT AGE EIGHTEEN AND WHO IS GENUINELY REMORSEFUL

**A.    Mr. Powell's History and Characteristics Support This Sentence**

In preparation for sentencing, Mr. Powell's family and an expert in gang psychology have participated in recorded interviews with the defense, which are compiled in a video concurrently filed with this memorandum as Exhibit B.

> 1.    <u>When Mr. Powell Was Just Five Years Old, His Father Was Killed in Gang Violence</u>

Mr. Powell spent his early years in Inglewood, the second of three children born to Mieka Lofton and Marvin ("Monty") Powell.  PSR ¶¶ 49-50.  He has an older brother, Mekhi Powell (age 23), and a younger sister, Mailon Powell (age 16).  *Id*. ¶ 50.

Mr. Powell was a happy and affectionate young boy.  As a young child, he was surrounded by family, with two loving parents and devoted grandparents living nearby. *Id*. ¶ 49.  Mr. Powell adored his parents and looked up to his father very much.



*Mr. Powell holding a portrait of his father*

Tragically, on February 5, 2006, the family's life was upended when Monty was murdered. *Id.* ¶ 51; *see also* Exh. C (Los Angeles City Council Record). Monty, who was only 27 years old, was shot while he was riding his bike through south central Los Angeles. *Id.* Despite a $50,000 reward offered by the Los Angeles City Council, *id.*, no suspect was ever identified. PSR ¶ 51. The family are certain that Monty's death was gang-related. *Id.* Just a few months after he was killed, armed men targeted the grieving family, breaking into their apartment, holding Mieka and her young daughter (then only a few months old) at gunpoint, and stealing the family's belongings. *Id.*

Mr. Powell was just five years old when his father was murdered. *Id.* He was devastated by his father's death. In the short-term, he was confused and terrified at the thought of never seeing his father again. In the longer term, the absence of his father disrupted his life in profound ways.

## 2. After Mr. Powell's Father Was Murdered, His Family Moved Constantly and He Lacked a Safe and Stable Home

After Monty was killed, the family was totally unmoored. Mieka became a single mother to three young children under the age of ten. *Id.* ¶ 52. With no financial support, and scared of being targeted by gang violence again, she was forced to move constantly. *Id.* She and the children were frequently homeless, living with friends, family, and even in cars. *Id.* As Mieka recalls in her letter:

> [L]ife was hard and changed for us after the death of his father in February 2006 . . . . Not knowing how to deal with the pain, our family bounced around between their grandparents for a while. We started moving around a lot, so the children went from school to school, never really being able to make a connection with friends.

Exh. D (Mieka Lofton letter) at 1.

This children's home environments were always changing and rarely safe. During the first few years after Monty was killed, Mieka had relationships with men who were volatile and, at times, violent. PSR ¶ 53. When Mr. Powell was six years old, he watched through a window as a his mother was beaten by a man in their

3

1    driveway.  *Id.*  He saw his mother run from the man, who pursued her and punched her.

2    *Id.*  On another occasion, he heard one of Mieka's boyfriends threaten to come over to

3    their apartment with a gun.  *Id.*  Sometimes, he was at the receiving end of physical

4    abuse.  Because Mieka worked and could not always handle childcare, Mr. Powell was

5    left in the care of an uncle who, sadly, beat him with his fists and a belt.  *Id.* ¶ 54.

6    Virtually all the men in his early life, and all the messages he received from them, were

7    violent.

8          Unsurprisingly, growing up in this environment had an enormous impact on Mr.

9    Powell, who was less than ten years old at the time.  Watching his mother being beaten

10   was terrifying and deeply upsetting.  When he was beaten by his uncle, he felt he must

11   be a bad child who deserved his uncle's anger.  Like many children who witness

12   violence in the home, he internalized feelings of anxiety and self-blame.[1]

13         3.   A Brief Period of Stability: a Stepfather and Life in Corona

14         When Mr. Powell was about nine years old, things stabilized temporarily when

15   his mother started a relationship with a new boyfriend, Mike Lofton.  *Id.* ¶ 55.  Over

16   time, Mike became a stepfather to Mr. Powell and his siblings.  *Id.*  He was kind to the

17   children, had a stable job, and helped support the family.  *Id.*  With their combined

18   income, Mieka and Mike were able to rent a large home in Corona.  *Id.*  The home was

19   in a gated community called "The Retreat," which was centered around a golf course

20   and clubhouse.  *Id.*  Mr. Powell recalls fondly that, for the first time, he and his siblings

21   had a yard and were able to play with other children on their quiet cul-de-sac.  *Id.*

---

[1] *See* Melissa M. Stiles, M.D., *Witnessing Domestic Violence: The Effect on Children*, 66 (11) Am. Fam. Physician 2052-67 (Dec. 1, 2002), *available at* https://www.aafp.org/afp/2002/1201/p2052.html (finding that children aged 5 to 11 who witness domestic violence are more likely to experience guilt, self-blame, anxiety, and depression).  Later, Mr. Powell also exhibited externalized behaviors that are common among adolescents who witness domestic violence, such as antisocial behavior, school truancy, and substance abuse.  *See id.*



*The family home in Corona*

Mr. Powell thrived during this brief period of stability. *Id.* ¶ 56. Though it lasted for only two years, his time in Corona was the longest period of consistency in his childhood since his father died. He enrolled in the local elementary school, where he played football and made friends. *Id.* He earned a position on the Corona Chargers junior football team, where he soon stood out as a talented receiver. *Id.* His coaches told him he was an exceptional football player. *See* Exh. E (Charlotte Bolden letter) at 1. This was the first time in his life he was told he excelled at something.

Mr. Powell and his siblings loved their school and their community. They made friends with other children in the neighborhood and played at the clubhouse, which bordered the golf course. Mr. Powell even started a small dog-walking business for other members of the community. *Id.* Looking back, he feels that this was the time in his life when he had the most hope, potential, and opportunity. *Id.* Though he still carried the sadness of his father's death, he was able to pour his adolescent energy into a supportive network of school, sports, and friends. For the first time in his life, he had stability and structure. He flourished.

5



*Mr. Powell's 2012 football trophy (age 11)*

*Mr. Powell's football team, 2013 (age 12)*

4.      <u>Uprooted: A Return to Homelessness and Constant Moving</u>

Unfortunately, when Mr. Powell was around 12 years old, his life was turned upside down again.  His mother and stepfather were no longer able to afford the house in Corona, and the family was evicted.  PSR ¶ 57.  Suddenly, they were homeless again.  *Id.*  They spent several months living in cars and motels.  *Id.*  For a while, they lived in a van parked near LAX airport.  Mr. Powell recalls coming home from elementary school one day to find that the van had been towed, along with all of their belongings.

Eventually, the children were dispersed to live with different grandparents.  *Id.* Mr. Powell lived for several months with his paternal grandmother in Lomita, and then with his maternal grandmother in Inglewood.  *Id.*  As a result of all this moving, he enrolled in several different schools.  Between kindergarten and 11th grade, he attended twelve different schools in Los Angeles, Lancaster, Corona, Lomita, Inglewood, Henderson, and Las Vegas.  *Id.* ¶ 75.

Mr. Powell was uprooted again when he was 13 years old, after Mieka and Mike found work and housing in Nevada.  *Id.* ¶ 58.  He was pulled out of school halfway through his 8th grade year and moved to Henderson, a Las Vegas suburb.  *Id.*  There, he enrolled in yet another school, where he was able to complete 8th grade.



5.     <u>Losing His Father Figure All Over Again</u>

Mr. Powell started high school in Henderson, at yet another school.  His junior year started off well: he made the football team and found new friends.  *Id*.  But just a few months into his junior year, his stepfather, Mike, was incarcerated on a six-year sentence.  *Id*. ¶ 59.  Mr. Powell was just 15 years old at the time.  With Mike incarcerated, Mieka could not afford the rent for their apartment in Henderson, and the family became homeless for a third time.  *Id*.

Mr. Powell describes Mike's incarceration as like losing his father all over again. *Id*.  Mike had been one of the few constants in his life.  He was loving and supportive, taught Mr. Powell to play football, and encouraged him towards positive goals.  Just like when his father died, the loss of Mike to prison unmoored the family again.  These repeated and sudden losses—of fathers, homes, schools, and livelihoods—made Mr. Powell feel that life was volatile and unpredictable, like bad things could happen at any moment.  He never knew what to expect: would they be moving next week?  Would they have a house to live in?  Would his parents be with him?  This constant uncertainty made him feel depressed, hopeless, and even suicidal at times.  *Id*. ¶ 67.  He started drinking alcohol heavily, often to the point of vomiting and passing out.  *Id*. ¶ 69.  He also started using Xanax, Percocet, and marijuana frequently, which numbed his feelings of depression and helplessness.  *Id*. ¶¶ 70-71.

Without Mike, Mieka was a single mother again.  She found a job at a call center, this time on the north side of Las Vegas.  *Id*.  With yet another move came yet another school change for Mr. Powell.  At the same time, Mieka's new job called for long shifts, and she was rarely home.  Now 16 years old, Mr. Powell was often left with no supervision.  He started acting out and skipping school.  *Id*. ¶ 60.  He was sent to a behavioral school for a few months, and then to Spring Mountain Youth Camp, a residential facility for teenage boys that offered structure, discipline, and training.  *Id*.

//

//

8

During Mr. Powell's nine months at Spring Mountain, his guidance counselors took an interest in him, and he did well. He worked in the kitchen and earned a "ServSafe" certificate in food handling, which he remains proud of. *Id.* ¶ 76. He also excelled on the football team as a receiver.[2] Football gave him the discipline, routine, and structure he had been missing. As he explains in the sentencing video, it also gave him something else: the experience of being on a team with other boys who looked like him, who came from dysfunctional homes like his, and yet who came together, trained hard, and, remarkably, won the state championship.



*Mr. Powell (circled) celebrating with his Spring Mountain teammates after winning the state championship*

---

[2] *See Malik Powell's long plays lead Spring Mountain by Beatty*, Las Vegas Review-Journal (Oct. 12, 2018), https://www.reviewjournal.com/nevada-preps/np-football/malik-powells-long-plays-lead-spring-mountain-by-beatty-1714780/; Sam Gordon, *Spring Mountain plays for 2nd state title in 3 years*, Las Vegas Review-Journal (Nov. 16, 2018), https://www.reviewjournal.com/sports/football/spring-mountain-plays-for-2nd-state-title-in-3-years-1529099/.

9

6.   <u>Mr. Powell Lacked the Ongoing Structure and
Support He Needed, and Replaced It With a Gang</u>

Mr. Powell successfully completed the program at Spring Mountain, but he was not permitted to stay there beyond age eighteen.  By this time, his mother and siblings had moved back in with his maternal grandmother, Charlotte Bolden, in Inglewood.  *Id.* ¶ 60.  Mieka picked Mr. Powell up from Spring Mountain and brought him to live with them.  It was a cramped situation in Ms. Bolden's small apartment in Inglewood, and there was a lot of street gang activity in the area, as Ms. Bolden explains in the sentencing video.  *See* Exh. B at 6:52-7:19.

Mr. Powell's family could not insulate him from the gang activity that surrounded him.  He started spending more time outside of the apartment and met other young men in the neighborhood.  In 2019, when he was just eighteen years old, he was "put on" by the Rollin 40s gang.  *Id.* ¶ 61.  Before joining the gang, he had no arrests or juvenile adjudications.  *Id.* ¶ 41-42.  Within weeks of joining the gang, however, he started getting arrested.  *Id.* ¶¶ 44-45, 61.  The gang was a catalyst into crime for a young man who was undoubtedly troubled, but who had never previously engaged in crime.  It was an on-ramp to a road that was difficult to get off.

The gang filled a hole in Mr. Powell's life.  As UCLA Professor and Los Angeles gang expert Dr. Jorja Leap explains in the sentencing video:

> The gang offered something that Malik had never experienced, which was real stability and structure.  There were periods in his life when he had this, but it was never consistent.  For the first time, the gang offered him something consistent: stability, structure and, probably most meaningfully, a sense of belonging.

Exh. B at 7:38-8:01.

Studies show that lack of parental monitoring and structure in the home make young people susceptible to gang recruitment, with youth in impoverished neighborhoods particularly at risk.  *See* Kate O'Brien et al., *Youth Gang Affiliation, Violence, and Criminal Activities: A Review of Motivational, Risk, and Protective*

10

*Factors*, 18 Aggression & Violent Behavior 417, 421 (2013).  Additionally, psychology studies show that young people are "overly motivated by reward seeking behavior, more susceptible to peer pressure, and more prone to risk-taking and impulsive behavior."  Selen Siringil Perke & Lael Chester, *Emerging Adults: A distinct population that calls for an age-appropriate approach by the justice system*, Emerging Adult Sc. in Mass. 1 (Jun. 2017).

This was certainly true for Mr. Powell.  He was recruited by the gang at a highly impressionable age.  In the gang, he was encouraged by older men who made him feel useful and important.  As his aunt says in the sentencing video, these older men gave him a false sense of being valued.  Exh. B at 8:01-8:22.  Looking back, Mr. Powell knows that he was pursuing short-sighted goals in the service of people who did not truly care about him.  But at the time, the gang gave him a sense of affinity and belonging.  This was certainly true in March 2021, when, at only twenty years old, he made the bad decision to participate in this offense at the behest of the gang.

**B.    A Decade in Prison Accounts for the Nature and Circumstances of the Offense, Affords Adequate Deterrence, and Protects the Public**

A sentence of 120 months is appropriate given the nature of this offense.  As discussed further below, the defense objects to the PSR's characterization of Mr. Powell's role in the offense, which is not supported by the evidence.  Nonetheless, Mr. Powell committed a serious crime, and the defense recognizes that it merits a substantial term in custody.  But while his offense is serious, it is mitigated by its context: the volatility that shaped his childhood, the gun violence that took his own father away from him, and the instability and loss that uprooted him every time he started coping with those circumstances.  The twenty-year-old who committed this crime must be understood in the context of this background.  Moreover, though his crime was ill-conceived and dangerous, he did not intend for anyone to get hurt.

Mr. Powell's youth at the time of the offense is also a significant mitigating factor.  Scientific research on brain development shows that the process of maturity

11

continues well into a person's twenties, with the pace of maturation in boys slower than that of girls.[3]  "The evidence is now strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable[.]"  Juv. Just. Ctr., Am. Bar Ass'n, *Adolescence, Brain Development, and Legal Culpability* (2004).

This research mitigates Mr. Powell's offense conduct and demonstrates why it is not predictive of his future behavior.  The Supreme Court has long recognized that, according to scientific research, juveniles have "'a lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking."  *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)).  The Court has also noted that "children are more vulnerable . . . to negative influences and outside pressures," and that "they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings."  *Id.* (internal quotation marks and citations omitted).  The Court has cited "developments in psychology and brain science that continue to show fundamental differences between juvenile and adult minds," particularly that "parts of the brain involved in behavior control continue to mature through late adolescence."  *Graham v. Florida*, 560 U.S. 48, 68 (2010).  The Court has reasoned that "those findings—of transient rashness, proclivity for risk, and inability to escape consequences—both lessened a child's moral culpability and enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed."  *Miller*, 567 U.S. at 472.  And while *Miller*, *Graham*, and *Roper* repeatedly make distinctions between "juvenile" and "adult" offenders, the Court was

---

[3] *See* Emily Buss, *What the Law Should (And Should Not) Learn From Child Development Research*, 38 Hofstra L. Rev. 13, 39-40 (2009); *see also* Selen Siringil Perke & Lael Chester, *Emerging Adults: A distinct population that calls for an age-appropriate approach by the justice system*, Emerging Adult Sci. in Mass. 1 (Jun. 2017) (finding that "cognitive skills and emotional intelligence continue to develop into a person's mid-20s, and even beyond").

12

clear in *Roper* that "the qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Roper*, 543 U.S. at 573.

All these cases, and the scientific research on which they are based, suggest that as a result of Mr. Powell's youth, a sentence beyond 120 months is not necessary for deterrence. As the Supreme Court held nearly thirty years ago, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Johnson v. Texas*, 509 U.S. 350, 368 (1993). Research on juvenile offenders has borne this out, showing a significant drop in crime with psychological maturity.[4] In this case, it is psychological counseling, vocational training, and drug treatment—rather than extensive incarceration—that is more likely to reduce Mr. Powell's risk of further impulsive behavior and criminal conduct. For a young man at such an impressionable age, a lengthy prison term will keep him out of the workforce, separate him from his supportive family, and surround him with older men with lengthier criminal histories. In short, it risks setting in stone the path that led him to commit this crime.

Finally, the question is not whether a sentence of longer than 120 months would promote deterrence and public protection, but what is the minimum term *necessary* to comply with those goals. *See* 18 U.S.C. § 3553(a). There is no evidence that lengthier sentences have proportionately greater deterrent value, as the Department of Justice has itself acknowledged.[5] What will ultimately avoid recidivism and protect the public is rehabilitation, as discussed in more detail below.

---

[4] *See, e.g.*, Paul Atkinson, *Age and the Decline in Crime* (Apr. 16, 2013), https://news.asu.edu/content/age-and-decline-crime (observing that "crime peaks around age 17, 18" and declines with psychosocial maturity); Gary Sweeten et al., *Age and the explanation of crime, revisited*, J. Youth Adolesc. (Jun. 2013), https://pubmed.ncbi.nlm.nih.gov/23412690/ (original study).

[5] Nat'l Inst. of Justice, *Five Things About Deterrence*, https://nij.ojp.gov/topics/articles/five-things-about-deterrence. This reality is widely accepted across deterrence scholarship. In the late 1990s, the British government asked

13

**C.** **A Decade in Prison Provides Just Punishment for Mr. Powell, Who Has Never Been to Prison, Has a Young Child, and Is Sincerely Remorseful**

    1.    <u>The Proposed Sentence Is a Serious Punishment for Mr. Powell, Who Has Never Been to Prison and Has a One-Year-Old Daughter</u>

This offense is unquestionably serious and merits a substantial term in custody. But a 120-month sentence is sufficient to afford just punishment. Mr. Powell is in Criminal History Category I and <u>has never been to prison</u>. *See* PSR ¶ 42. For a young man in his position, a decade in custody is a serious punishment. By comparison, the Probation Office recommends a sentence of 166 months, or nearly 14 years. But an additional 46 months is not necessary to afford adequate punishment in this case.

Ten years in prison is a life-altering penalty for a young man like Mr. Powell. At a minimum, he will be 31 years old when he is released. He will miss the first decade in the life of his one-year-old daughter, Mercedes. He will miss her key milestones, such as her first words, her first day at school, learning to read, the ups and downs of early friendships, and graduating from kindergarten. As his sister, Mailon, writes in her letter: "He is missing out on so many things like her first steps, her first laugh, and hearing her say words like 'dada'." Exh. F at 1. Mr. Powell is very worried about the impact of his incarceration on his relationship with Mercedes. His mother takes care of Mercedes every weekend and brings her to see him in jail. For a new father as devoted as Mr. Powell, the loss of this irreplaceable time with his daughter is more than sufficient to provide just punishment.

---

the Institute of Criminology at Cambridge University to conduct a review of deterrence research. The resulting report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects." Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and Per-Olof H. Wilkstrom, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research*, Oxford: Hart Publishing (1999). The certainty of punishment is more effective for deterrence than the severity of punishment. *See* Daniel Nagin and Greg Pogarsky, *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence*, Criminology 39(4) (2001); David Farrington, Paul Langan, Per-Olof H. Wikstrom, *Changes in Crime and Punishment in America, England and Sweden between the 1980s and 1990s*, Studies in Crime Prevention 3:104-131 (1994).

14

2.   <u>Mr. Powell Has Spent His Time in Pretrial Detention Reflecting on His Conduct and Is Genuinely Remorseful</u>

The eight months Mr. Powell has spent in detention represent the longest time he has ever been incarcerated.  That time has had a profound impact on him.  His family all remark on his changed attitude in their letters.  *See* Exh. D (Mieka Lofton letter) at 1 ("Since Malik has been incarcerated, I see a big difference in his attitude.  I see him taking accountability for his actions and ready to move forward to becoming a better man, father, son and brother."); Ex. E (Charlotte Bolden letter) at 1 ("Since Malik has been incarcerated, I have noticed a big change in him.  Malik knows and accepts the fact that he did wrong[.]"); Ex. F (Mailon Powell letter) at 1 ("I have noticed a huge change in Malik's behavior since he's been in jail.").

This turnaround is also evident from Mr. Powell's own letter, in which he recognizes how dangerous his conduct was and reflects on how much worse the outcome could have been.   He writes:

> I had so much built up anger which caused me to commit an unnecessary act of violence like this.  I don't blame anyone but myself for my actions and for that again I want to say that my pas[t] poor choices would be an understatement.  I never thought about the consequences of my actions, moreover I never thought about what could happen.  I never intended for anyone to get hurt which clearly demonstrates I've made a very poor choice at the time.  My actions since then have caused me a lot of regrets.
>
> [. . . .]
>
> [W]hen I think about the victims, there are so many "what if's . . . ." I think about like what if there were kids involved, what if someone passed, what if the lady passed, what if that was my mom, sister or even my daughter in this situation.  I am felt up with sorrow, guilt, and regrets.  I want to apologize to my family but most importantly I want to apologize to the victims for putting them in this situation.

Exh. A at 2.

Mr. Powell feels ashamed when he imagines the trauma he has likely caused the victims and witnesses, especially given his family's own experience of being traumatized by gun crime and gang violence.  He writes:

15

> I think about the victims everyday and wonder what they go through. An act like this can cause serious trauma to a person and affect somebody's wellbeing and mental health. With my dad passing away me and my family have been experienced with trauma. Shortly after him passing our house was robbed at gunpoint. They never found his killers or the people who robbed us, so we would always live looking over our shoulders. So I know how trauma can really affect them.

*Id.*

Mr. Powell's letter shows true remorse and insight. When he looks back at what led him into the gang, he reflects: "I was constantly trying to impress others and worried about what others think. I was trying to make a name for myself. I was searching for an identity, love, respect, a place of belonging, and a purpose and those are my blind spots which I truly regret." *Id.*

Mr. Powell is genuinely committed to putting the gang behind him. His plans for his time in custody "are to work on my poor choices along with my shortcomings, to gain my GED and whatever knowledge and skills I can gain to develop[] myself in order to promote a more robust and knowledgeable person that is more welcoming to society and my family. I will also be preparing myself to be a more influential father figure to my daughter where I can show her a much better life than what I lived. She means the most to me so my most important goal is to get back to her." *Id.* at 2-3.

3. The Time Mr. Powell Has Served to Date Has Been Unusually Punitive

The time Mr. Powell has served to date has been much harder time, with a far more punitive effect, than would normally be expected. He has been detained in Santa Ana Jail since he was taken into federal custody in May 2021. Because of the pandemic, conditions at the jail have been unusually harsh and restrictive. Normal out-of-cell time has been cut to a fraction, family visits have been periodically suspended, and he has he had limited opportunities to call his family and check on their wellbeing, including the health of his beloved grandmother. He has spent endless hours in his cell while a virus spreads through the facility. The Court should take these unusually punitive conditions into account in assessing the appropriate sentence. *See Bell v. Wolfish*, 441 U.S. 520, 536 (1979) (holding that the goal of pretrial detention is to

16

1   ensure presence at trial, not to punish).  Moreover, these harsh conditions have had an

2   immense impact on Mr. Powell, a young man who has never previously set foot in

3   prison.  Rather than endure anything like this again, he is committed to building a law-

4   abiding future for himself once he completes his sentence.

5   **C.    The Need to Provide Mr. Powell with Education, Training, and**

6   **Treatment in the Most Effective Manner Supports This Sentence**

7          Additional prison time, beyond ten years, would not serve the rehabilitative

8   purposes of sentencing.  A decade in custody is more than sufficient for Mr. Powell to

9   take advantage of the educational and rehabilitative services that the Bureau of Prisons

10  has to offer, including mental health treatment, vocational training, and educational

11  opportunities.  *See* PSR ¶¶ 103-110; *see also Tapia v. United States*, 564 U.S. 319, 335

12  (2011) ("[A] court may not impose or lengthen a prison sentence to enable an offender

13  to complete a treatment program or otherwise to promote rehabilitation.").  As he

14  writes in his letter, he is committed to using his time in custody wisely.  *See* Exh. A at

15  3.  He has already taken concrete steps towards this plan; he is taking G.E.D.

16  assignments and classes at Santa Ana College's School of Continuing Education.  *See*

17  Exh. G (Malik Powell 2021 Certificates).  That he has seized the educational

18  opportunities available to him in pretrial detention, which are limited due to the

19  pandemic, show that he is serious about rehabilitation.

20         Though Mr. Powell welcomes substance abuse treatment, PSR ¶ 68, he is

21  unlikely to qualify for RDAP as a result of his 924(c) conviction.  *See* Exh. H (BOP

22  Prog. Stmt. P5162.05) at 2-4.  Fortunately, the drug and alcohol treatment this Court

23  can provide in the community far surpass the resources available inside the prison

24  walls.  For this reason, the defense's proposed sentence includes five years of

25  supervised release—the maximum available—which will provide him with the

26  treatment, support, and oversight he needs to adjust from prison to life on the outside.

27         Once Mr. Powell is released, he will have the support of his mother, his aunt, his

28  grandmother, and his siblings.  *See generally* Exh. B (Sentencing Video); Exh. D

17

(Mieka Lofton letter); Exh. E (Charlotte Bolden letter); Exh. F (Mailon Powell letter). With this strong support network, he is well positioned to succeed on release.

Research into juvenile offending shows that family relationships, positive peer groups, schooling, employment, and stable housing correlate with a drop in crime from age 15 to 25.[6] This is echoed by Dr. Jorja Leap, who says in the sentencing video: "You cannot take the gang away without putting something in its place. So, when I think about the factors that led to his gang membership, they are the same factors that will lead to his recovery and his successful reentry: structure and stability." Exh. B at 9:34-9:51." Dr. Leap points to extremely effective reentry programs available in Los Angeles, including Homeboy Industries and the Anti-Recidivism Coalition, both of which offer wraparound services. *Id.* at 9:52-10:23. Homeboy Industries is the largest gang rehabilitation and reentry program in the world, and it offers free vocational training, job placement, tattoo removal, substance abuse treatment, and mental health counseling. *See* Homeboy Industries, *General Information*, https://homeboyindustries.org/learn-more/faq/. Prior to this case, Mr. Powell had never heard of these programs. He is eager to access them so he can make better choices in his life. With the right support, he will be well positioned to do so.

**D.    The Need to Avoid Unwarranted Sentencing Disparities**

The codefendants share the mitigating factor of their youth, but Mr. Powell's codefendant, Khai McGhee, is differently situated because he is in Criminal History Category III, which yields a higher guidelines range. According to McGhee's PSR, his guidelines range on all counts is 177-191 months; according to Mr. Powell's, his range is 166-177. Even if the Court agrees with the defense that the correct Total Offense Level is 21 (not 23), Mr. McGhee's range will remain higher (166-177 months, as

---

[6] *See* Atkinson, *supra* note 4 (examining data from a longitudinal study that followed 1,300 serious juvenile offenders over a seven-year period, and finding that "social learning" was the most significant factor in the drop in offending over time, i.e. that young people learn to engage in crime—or refrain from crime—through their associations with others).

18

compared to 157-166 for Mr. Powell).  Mr. McGhee was involved in criminal activity on a consistent basis starting at age 15, accumulating sufficient criminal history points in the short space of two years to put him in Category III.  *See* McGhee PSR ¶¶ 38-50.

As the Supreme Court has recognized, the flip-side to avoiding unwarranted sentencing disparities is "the need to avoid unwarranted sentencing *similarities*" among defendants who are not similarly situated.  *United States v. Gall*, 552 U.S. 38, 55 (2007) (emphasis in original).  The difference between being in Criminal History Category I and Category III is a meaningful one.  "The criminal history guidelines are based on the principle that '[a] defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment.'"  *United States v. Marler*, 527 F.3d 874, 877 (9th Cir. 2008) (quoting U.S.S.G. Ch. 4, pt. A, introductory cmt.).  This disparity between the codefendants should be taken into account at sentencing.

### III. OBJECTIONS TO PSR

**A.  Factual and Legal Objection to Four-Level "Serious Bodily Injury" Enhancement Under § 2B3.1(b)(3)(B)**

The defense agrees that Mr. Powell is in Criminal History Category I.  It objects, however, to application of the four-level enhancement for "serious bodily injury" rather than the two-level enhancement for "bodily injury."  *See* PSR ¶¶ 25-27.  The PSR applies the four-level enhancement, reasoning that: "Here, during the commission of the robbery, a struggle ensued and two rounds were discharged from the gun, one of which struck Victim 2 in the leg, causing serious bodily injury.  Therefore, the 4-level increase applies."  *Id*. ¶ 27.  But the government has not satisfied its burden of establishing "serious bodily injury" rather than "bodily injury."  *See United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005) (holding that the government bears the burden of proof when it seeks sentencing enhancements).

The guidelines define "serious bodily injury" as follows:  "'Serious bodily injury' means injury involving extreme physical pain or the protracted impairment of a

19

function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation.[7]  U.S.S.G. § 1B1.1 App. Note 1(M).  By contrast, the guidelines define "bodily injury" as: "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought."  *Id.* at App. Note 1(B).

Here, the government has produced photos of Victim 2, who was struck in the leg by a stray bullet during the offense.  Exh. H (Photos of Victim 2).  Without wishing to minimize Victim 2's experience, the injury depicted is a surface wound that does not meet the definition of "serious bodily injury."  As to the first prong of the definition, the government has not produced evidence that the injury involved "extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty."  The government has not produced any medical records for Victim 2.  The PSR states that "[t]he extent of injuries sustained by Victim 2 is not known."  PSR ¶ 17.

As to the second prong of the definition, there is a difference between being taken to an emergency room and sustaining an injury that "required medical intervention such as surgery, hospitalization, or physical rehabilitation."  U.S.S.G. § 1B1.1 App. Note 1(M).  The photos of Victim 2 do not show any treatment being administered, nor is it apparent that she was actually admitted to hospital.  *See* Oxford Languages, https://tinyurl.com/mryjvnvw (defining "hospitalization" as "admission to hospital for treatment").  Rather, they show that Victim 2 was taken to an emergency room, where her wound was measured with a ruler and photographed.

---

[7] Case law illuminates proper application of the "serious bodily injury" enhancement.  For example, in *United States v. Lavert*, 830 F. App'x 894, 895 (9th Cir. 2020), the Ninth Circuit affirmed the enhancement where the defendant "struck the victim on the head with a gun, causing laceration requiring nine staples, continuing treatment for trauma and the head injury, and an extended medical leave from work."  And in *United States v. Corbin*, 972 F.2d 271, 272-72 (9th Cir. 1992), the Ninth Circuit affirmed the enhancement where the victim was hit "on the head with a metal object resembling a gun, causing a laceration which required a two-layer closure using more than 25 sutures."

20

Perhaps because the government has not satisfied its burden, the PSR includes a footnote stating that: "Application Note 1 of USSG. § 1B1.1 further includes 'serious bodily injury' when defining 'dangerous weapon' in Application Note 1(E): ''Dangerous weapon' means (i) an instrument capable of inflicting death or serious bodily injury . . . .'" PSR ¶ 27, n.2. But it does not follow from the fact that the guidelines define "dangerous weapon" to include an instrument capable of inflicting serious bodily injury that using a dangerous weapon, by itself, justifies the "serious bodily injury" enhancement. A dangerous weapon can, of course, be used without causing "serious bodily injury"—such as where a firearm was fired and missed, or where, like here, it was discharged and caused only "bodily injury." The robbery guideline includes a separate firearm enhancement, § 2B3.1(b)(2), and Mr. Powell is already being punished with a ten-year mandatory minimum for the fact that a firearm was discharged.[8] That a firearm was involved does not, on its own, support the "serious bodily injury" enhancement.

That said, the defense acknowledges that there was "bodily injury" in this case, and that the two-level enhancement therefore applies. Accordingly, the correct total offense level is 21 (not 23), which produces an advisory guidelines range on Counts 1 and 2 of 37-46 months (instead of 46-57 months). Including the consecutive sentence of 120 months on the 924(c) count, Mr. Powell's aggregated advisory range is 157-166 months (not 166-177, as calculated by the Probation Office).

**B.    Factual Objection to Description of Offense Conduct in the PSR and the Probation Office's Disclosed Recommendation Letter**

Mr. Powell acknowledges his culpability for the 924(c) charge under an aiding and abetting theory, but denies personally brandishing the firearm. *See* Dkt. No. 78

---

[8] To avoid double-counting, the firearms enhancement in § 2B3.1(b)(2) does not apply where a sentence is imposed for a § 924(c) conviction. *See* U.S.S.G. § 2K2.4 App. Note 4 (instructing that, where a sentence is imposed for a 924(c) conviction, "do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense"); *United States v. Park*, 167 F.3d 1258, 1260 (9th Cir. 1999).

21

(Amended Joint Status Report and Factual Basis) ¶ 2 (admitting culpability under aiding and abetting theory).  Yet, in describing Mr. Powell's offense conduct, the PSR and Probation's Recommendation Letter include statements that go far beyond the factual basis and are not supported by the record.  *See* PSR ¶ 13 ("Powell held a Glock 19 pistol to Victim 1's head") *and* Dkt. No. 91 (Probation's Recommendation Letter) at 5 ("Powell held a pistol to the victim's head").  <u>The Court should strike this language from both the PSR and the Recommendation Letter</u>.

The government has not proved that Mr. Powell personally brandished the firearm, even by a preponderance.  *See United States v. Flores*, 725 F.3d 1028, 1041 (9th Cir. 2013) (holding that the government bears the burden of proof with respect to sentencing enhancements, and a sentencing court may not rely on unsupported factual statements in the PSR).  Indeed, the government has not adopted the Probation Office's description of Mr. Powell's offense conduct in its sentencing position.  *See* Dkt. No. 94 (Gov't SPP) at 3, 5.

There were three co-conspirators physically present at the robbery, all wearing face masks and hoodies.  One wore a blue tracksuit, the second wore a black tracksuit, and the third wore a light gray tracksuit:



Suspect #1          Suspect #2          Suspect #3

Exh. I (Search Warrant and Statement of Probable Cause) at 5.

22

1    The still above, taken from surveillance footage, is the clearest image of those

2    three co-conspirators.  Mr. Powell and Mr. McGhee admit to being two of the three, but

3    the government has not established which two they were, nor has it identified the third

4    co-conspirator.  A Los Angeles Police Department Gang Officer, Chad Scott, who is

5    familiar with Mr. Powell, identified Mr. Powell as the suspect in the <u>black</u> tracksuit

6    (Suspect #2 above).  *Id*. at 14 ("Detective Burger showed Officer Scott photographs of

7    Suspect #1, Suspect #2, and Suspect #3.  Based on his personal interactions with

8    Powell, Officer Scott informed Detective Burger that he believes Suspect #2 is

9    Powell.").  But the victim who was held at gunpoint identified the gunman as wearing a

10   <u>light gray</u> tracksuit:

11

12   ▇ made eye contact with the individuals and they began running towards him.  One of the suspects wrapped his arm
     around ▇ neck in a choke hold type motion and pulled him to the side while ▇ was still in his seat.  **The next**
13   **suspect (S1) placed a handgun against ▇ head.**  The third suspect grabbed the victim's wrist (unspecified which
     wrist) and held onto the watch.  The watch was grabbed with such force, the suspect pulled the victim out of his chair
14   and the watch came off the victim's wrist.

15   [ . . . ]

16

17   ▇ described the suspects as follows:

18      • **S1:** male, Black, approximately 20 years old, **wearing a light gray Nike track suit**

19      • S2-S3: male, Black, approximately 20 years old, wearing black track suits

20

21   Exh. J (Extract of Crime Report) at 1.

22        This suggests that the co-conspirator in the gray tracksuit, not Mr. Powell, was

23   the gunman.  Moreover, the government compared fingerprints and DNA taken from

24   the gun to fingerprints and DNA taken from Mr. Powell, and they did not match.  *See*

25   Exh. K (Fingerprint Report); Exh. L (DNA Report).  Finally, to the extent the PSR

26   relies on the statements of a cooperator, ▇▇▇▇, it is undisputed that ▇▇

27   ▇▇▇▇▇▇▇ cannot have known

28

23

which of the co-conspirators was the gunman.  In sum, the government has not satisfied its burden of proving, even by a preponderance, that Mr. Powell was the gunman.  The Court should strike the statements to that effect from the PSR and Recommendation Letter, and it should not consider those statements in sentencing Mr. Powell.

Finally, the defense respectfully requests that the Court vary downward from the advisory guidelines range for all the reasons set forth in this memorandum.

### IV. CONCLUSION

A sentence of 120 months, followed by 5 years of supervised release, is a meaningful penalty that will still afford Mr. Powell a chance to redeem himself.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  January 31, 2022        By    /s/ Kate L. Morris
_____
KATE L. MORRIS
Deputy Federal Public Defender

DATED:  January 31, 2022        By    /s/ Kim Savo
_____
KIM SAVO
Deputy Federal Public Defender

Attorneys for MALIK LAMONT POWELL